IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

QUENTRELL EUGENE WILLIAMS,

                           Plaintiff,                      OPINION AND ORDER

    v.

                                                                   18-cv-1008-wmc

DANE ESSER, *et al.*,

                           Defendants.

Now incarcerated at Waupun Correctional Institution, *pro se* plaintiff Quentrell Williams suffers from asthma, making use of the incapacitating agent oleoresin capsicum ("OC") "contraindicated."  Unfortunately, Williams also has a history of engaging in severe self-harm, often using objects that he conceals from prison officials.  Williams filed this lawsuit under 42 U.S.C. § 1983, bringing claims related to events that occurred in 2013, when he was incarcerated at the Wisconsin Secure Program Facility ("WSPF").   In particular, the court granted Williams leave to proceed on the following, allegedly unjustified uses of force during WSPF staff's interventions to interrupt or prevent his self-harm:  Eighth Amendment claims against defendant Dane Esser for using OC spray to control Williams on Williams March 3, May 25 and June 29, 2013, and tasing him on June 25, 2013; an Eighth Amendment claim against defendant Chad Lentz for giving Williams a glass nasal spray bottle that he immediately used for self-harm on March 3, 2013; and Eighth Amendment claims against defendants Tim Haines, Sarah Blume, Beth Edge and Angela McClain (formerly Reuter) for failing to intervene in Esser's uses of force.

Currently before the court is defendants' motion for summary judgment (dkt. #72), which will be granted in part.  To begin, defendants Haines, Blume, Edge and McClain are entitled to summary judgment because no evidence has been offered on which a reasonable

jury could find that any of these defendants knew Esser was violating Williams' constitutional rights, had a reasonable opportunity to prevent that violation, and failed to do so.  In addition, Esser is entitled to summary judgment with respect to each of the four, use-of-force incidents, since no reasonable jury could find that Esser intended to harm Williams, rather than ensure his safety.  However, the court must deny defendants' motion with respect to Lentz's action on March 3, 2013, since a reasonable jury could conceivably conclude that Lentz violated Williams' Eighth Amendment rights if they credit his version of the events.  Accordingly, that claim alone will proceed to trial.

## UNDISPUTED FACTS[1]

### A.    Parties

Plaintiff Quentrell Williams was incarcerated at WSPF between March and July of 2013, and his contraindication to incapacitating agents due to his asthma had been documented and included in Williams' medical file at the institution since his arrival at WSPF.

All six defendants are current or former WSPF employees:  Dane Esser is a Captain, and was working as a Lieutenant during the time relevant to Williams' claims; Tim Haines was the warden at the time; Chad Lentz was a correctional officer ("CO"); and Sarah Blume, Beth Edge and Angela McClain were nurses.

---

[1] Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of facts and the evidence of record cited below, while viewing that evidence in a light most favorable to plaintiff as the non-moving party.

### B.    March 3, 2013

On March 3, 2013, Williams was on clinical observation status for close monitoring, after being deemed a danger to himself the previous day, March 2.  CO Lentz had only been working at WSPF for a few days, and he was assigned to the Alpha Unit in WSPF's Restrictive Housing Unit.   In particular, on March 3, CO Lentz was assigned with administering the medication cart that had been prepared in advance by Health Service Unit ("HSU") staff.  At approximately 8:00 p.m., Lentz arrived at Williams' cell.

Lentz recalls giving Williams several pills in a paper cup and, at Williams' request, handing over his glass nasal spray bottle.  Since that spray bottle was on the cart stocked by HSU staff, Lentz attests that he assumed (mistakenly it turns out) that Williams was allowed to use the spray and return it to him.  At that time, Lentz further attests that he was unaware of any policy prohibiting an officer from providing a medication to an inmate on observation status, including a glass nasal spray bottle.  (Lentz Decl. (dkt. #78) ¶ 6.) Further, Lentz explains that he had just recently been working at Columbia Correctional Institution, where the practice was to post a sticker on an inmate's cell indicating "no glass" if they were not allowed to possess such items.  (*Id.*)

In contrast, Williams claims that Lentz *knew* that he could not receive the nasal spray bottle, arguing that:  (1) inmates on clinical observation status are not allowed to possess glass nasal spray bottles; and (2) a correctional officer in Lentz's position should have been trained to avoid giving a glass bottle to someone placed on observation, especially since Williams had just been deemed a danger to himself.  Williams further claims that he did *not* ask for his nasal spray.  In fact, according to Williams, he told Lentz "these motherfuckers don't believe I'm going to self harm with the first thing I get," and

3

Lentz responded by smirking, shaking his head, and then providing him the nasal spray. (Williams Decl. (dkt. #84) ¶¶ 2-6.)[2]

The parties agree about what happened next. Lentz watched Williams use the nasal spray, and when Williams did not immediately return it, Lentz first asked and then ordered him to return the bottle to the white box, but Williams refused. Correctional officer Foley then walked onto the range and also ordered Williams to return the bottle twice. Williams not only refused to do so, but threw the bottle at the wall and started to eat the pieces of glass.

Lentz does not say whether he personally alerted any other staff to Williams' behavior, but Lieutenant Esser attests that he learned Williams had broken the glass nasal spray bottle and was eating the broken pieces at approximately 8:30 p.m. When Esser went to Williams' cell, he saw what appeared to be brown tinted glass in Williams' mouth. At that point, Lieutenant Esser: (1) ordered Williams to stop chewing the broken glass and spit it out; (2) ordered staff to bring him OC spray while he stayed at Williams' cell door and tried to get him to stop eating the glass; and (3) radioed for additional support staff in the event a cell entry became necessary.

At that time, Esser claims that he did not know whether Williams had a contraindication to incapacitating agents in his medical file, while Williams claims he did. Even if Williams could offer proof of Esser's advance knowledge, however, this dispute is

---

[2] Although this latter claim seems incredible on its face, such malevolence is not beyond all possibility and must be accepted for purposes of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

not material, since Williams acknowledges that Esser was permitted to use incapacitating agents on him under DAI Policy 306.07.03V, which states that in the event of planned uses of force, it is permissible to use OC if the need to do so is greater than the risk to the inmate if the OC is not used.  When a security tool (OC, a Taser, pepper balls) is used, the same policy states that HSU staff must be present if possible, and a medical staff member must be advised as soon as possible after the tool is used.

Lieutenant Esser attests that he told Williams he was going to administer a burst of OC into his cell if he did not comply with his orders, and further attests that when Williams did not comply, he administered a "one-second burst" of OC, causing Williams to instantly comply, stop eating glass, and place his hands out of the door trap to be secured.  (Esser Decl. (dkt. #77) ¶ 9.)  Not surprisingly, at this point, Williams disputes this, attesting that he never heard Esser say *anything* before he began spraying him; rather, he remembers that Esser just started spraying him and the actual burst lasting some "3 to 5 seconds." (Williams Decl. (dkt. #84) ¶¶ 8, 12.)

Lieutenant Esser also offers an explanation as to why he chose OC spray over other possible interventions methods.  Specifically, he attests that his normal practice at the time would have been to contact his supervisor to use force against Williams, but that exigent circumstances gave him the authority to use OC spray without permission.  (Esser Decl. (dkt. #77) ¶ 6.)  Understandably enough, Esser attests that he believed there was no time to get permission to avoid Williams injuring himself further.  (*Id.*)  In addition, Esser states he believed OC spray was the best course of action because:  (1) entering Williams' cell was more likely to cause injury to both inmates and staff; (2) OC spray has a lower propensity to cause injury than physical force; (3) Williams was holding glass pieces that

5

he could use as a weapon against staff; (4) Williams was in the process of harming himself; and (5) it would have taken too long to assemble a cell entry team to stop Williams' ongoing self-harm.  (*Id.* ¶ 7.)[3]

After Williams complied, staff restrained and removed him from the cell.  Nurse Blume was on the unit and examined Williams in the medical room of the unit.  Williams' vitals were taken, and he was escorted to a holding cell, as well as given a shower to wash off the OC spray.  Williams then complied with a strip search, during which no contraband was recovered.  Blume then informed Lieutenant Esser that Williams needed to be transported to Boscobel Hospital.  However, at the hospital, Williams refused all treatment, so he was transported back to WSPF and placed back into clinical observation status at approximately 10:00 p.m. that same day.

### C.    May 25, 2013

Almost three months later, on May 25, Williams was housed in the Restrictive Housing Alpha Unit.  At approximately 7:00 p.m., Sergeant Hulce reported to Lieutenant Esser that Williams had covered his cell window with human feces and was hiding in the corner of his cell underneath his segregation smock and mat, preventing him from being verified.[4]  Esser next alerted Captain Brown of the situation and went to Williams' cell,

---

[3]  Williams purports to object to now-Captain Esser's explanation for his use of OC spray because he is not qualified to testify as an expert about the appropriateness of OC spray.  However, Esser is not testifying as an expert, but from personal knowledge in response to Williams' claim against him.  Accordingly, this objection is overruled.

[4]  Williams disputes *part* of this proposed factual finding, pointing out Hulce's incident report did *not* indicate that he told then-Lieutenant Esser that Williams was hiding in the corner of the cell under his smock and mat.  (*See* Def. Ex. 1002 (dkt. #75-3) 9.)  Whether this dispute is even relevant, much less materially so, is open to argument, since Hulce's later-written incident report is certainly not dispositive as to what Esser actually learned on the evening of May 25, 2013.  In any

where he confirmed Hulce's report *and* found further that Williams had also covered the camera in his cell with feces.  As a result of all of these efforts to obscure the view into the cell, Esser could only see half of Williams' right foot through the cell window.

Lieutenant Esser attests that he loudly announced his presence to Williams, then gave him several loud commands, including that Williams acknowledge he could hear him, so that Esser could verify that he was okay and not engaging in self-harm.  According to Esser, Williams did not respond, and after several more failed attempts to get a response from Williams, Esser next told Williams that OC spray would be administered unless Williams responded and came to the door.  Williams claims that he did not respond because he was asleep and could not hear him.  (Williams Decl. (dkt. #84) ¶ 14.)[5]

Regardless, given no response, Esser decided to administer OC spray because he could not see whether Williams had access to possible weapons, and again attests that he believed it was too dangerous for staff to enter Williams' cell since staff could neither see him clearly nor assess whether he presented a danger.  Esser also attests that he believed there was not enough time to gather a response team because Williams might be in medical distress.  Still, Esser did not administer OC immediately; instead, he directed staff to retrieve the spray and asked Captain Brown to inform WSPF's Security Director Sweeney that if Williams continued to ignore his directives, Esser would administer OC spray.

---

event, Williams does not dispute that his cell window was covered, and his well-being could not be verified.

[5]  Again, Williams' version of events defies credulity, but he includes several proposed findings of fact related to DAI Policy 306.07.01 VIII. F -- a policy that he claims suggests that the use of incapacitating agents and electronic tool devices must only be used when an inmate is actively resisting.

When Williams still did not comply, the Lieutenant administered a one-second burst of OC spray into Williams' cell.  After Williams did not move or respond to this first spray, Lieutenant Esser applied a second burst of the same length, at which point Williams came to the cell door and put his hands through the trap so he could be restrained and removed.

Once removed, this time Nurse McClain checked Williams' vitals, administered his inhaler, and cleared him to return to his cell, after which Williams was escorted back to an observation cell on Alpha Unit.  While Williams claims he was still "having a hard time breathing" when he was placed in the cell, he does not attest to *telling* McClain that he was still having trouble breathing when she cleared him to be returned to an observation cell. (Williams Decl. (dkt. #84) ¶ 17.)  Williams further attests that later he was returned to see a nurse; at which point, he received a nebulizer treatment, although he does not attest that McClain was involved.  (*Id.*)

### D.     June 25, 2013

Apparently, another month then passed without incident.  However, on June 25, at about 4:50 p.m., Sergeant Overbo informed Lieutenant Esser that Williams had covered his cell window with Styrofoam from his lunch tray and was hiding in the far corner of his cell, so staff could not see him.  The Sergeant also told Esser that after climbing onto pipes in the closet behind Williams' cell, staff were able to see him inside, scratching his arm with an unidentified white object.  Sergeant Overbo also told Nurse McClain the same thing.

Still, from his angle, Lieutenant Esser could not see into Williams' cell, so he asked Williams to come to his cell window so they could talk.  After Williams came to the window, Esser attests that he could see Williams was hiding his left arm behind his back, as well as an unidentified white object in his mouth.  (Esser Decl. (dkt. #77) ¶ 21.)  In contrast, Williams attests that he was not engaging in self-harm at that time, and he did not have anything in his mouth.  (Williams Decl. (dkt. #84) ¶ 18-21.)  Even so, Williams does not dispute Esser's statement that he was hiding his left arm behind his back.  (*See id.*)

Lieutenant Esser attests that he then reminded Williams not to cover his cell window because staff had to check on him every 15 minutes, then ordered him to remove the Styrofoam from the window and hand it through the trap door.  (Esser Decl. (dkt. #77) ¶ 22.)  Williams claims that Esser instead told him he wanted to remove him from the cell and search him, but (again, incredibly) never explained *why* he wanted to search him.  At that time, Williams further attests to telling Esser that he was not self-harming and even showing Esser his arms.  (Williams Decl. (dkt. #84) ¶ 22.)  However, Williams does not attest that he complied with Esser's order to remove the Styrofoam.

At that point, Lieutenant Esser sought permission from Security Director Sweeney to use force in the event Williams continued to refuse his orders.  Upon returning to Williams' cell, Esser informed him that if he did not remove the Styrofoam from his cell window and hand it out, he now had permission to use force.  When Williams continued to refuse to comply with Esser's order, he directed staff to put on the proper protective gear and prepare to enter and forcibly remove Williams from his cell.  After asking Williams once more if he would comply with his order and being refused, a "use-of-force" team

entered Williams' cell and restrained him at his wrists and ankles, then escorted Williams to a holding cell for a staff-assisted strip search.[6]

The parties also dispute whether Williams complied with Lieutenant Esser's orders during the strip-search.  Esser attests that Williams refused to open his mouth several times, and so he directed staff to apply pressure points or compliance holds below Williams' jaw and behind his ears.  According to Esser, because Williams continued to refuse to open his mouth, he also performed a "test arch" with the taser as a show of force, while directing Williams to open his mouth, but Williams still refused.  Therefore, Esser tased Williams in "Drive stun" mode on Williams' right-upper pectoral area for approximately 2-3 seconds, meaning that the taser cartridge was removed from the cartridge bed but no probe was deployed.  Esser attests that he used the taser because the pressure points and compliance holds were not working, and in his experience, the taser had a lower propensity for causing injury to the inmate and staff, as opposed to the continued use of physical force.  (Esser Decl. (dkt. #77) ¶ 27.)

For his part, Williams attests that he *had* complied with Esser's order by the time *any* force was used, with his hands cuffed behind his back and tethered to the strip cage door, shackles around his ankles, and his not being resistive or combative.  (*Id.* ¶ 69.)  Even more specifically, Williams attests that Esser had ordered officers to apply the pressure points and compliance hold *after* he had opened his mouth, and then he was "Drive stunned" on top of that, even though he was still not actively resisting.  (Williams Decl.

---

[6] Now-Captain Esser attests a staff-assisted strip search was necessary to ensure Williams possessed no contraband that he could use to harm himself, since Williams was by now well known to hide contraband to use for self-harm, and Esser had observed an unidentified object in Williams' mouth.  (Esser Decl. (dkt. #77) ¶ 26.)

10

(dkt. #84) ¶ 23.)  Unfortunately, the available video on that day is too far away to determine what, if anything, occurred during the scrum of officers surrounding the plaintiff following their cell removal operation.  Ultimately, nothing was recovered from Williams' mouth, nor did he appear to suffer any self-harm injuries.  Esser attests that Williams also refused to be examined by medical staff, so he was escorted back to his cell after it was searched and all property was removed, while Williams claims that he requested to see a nurse, but that request was denied.

### E.    June 29, 2013

A few day later, on June 29, Sergeant Scullion told Lieutenant Esser that Williams had a "piece of sheet" and was hiding in the corner of his cell doing something with it. After Esser went to Williams' cell, the parties again dispute material parts of their interaction.  Esser claims that he saw Williams with a sheet wrapped around his neck while pulling it tight to strangle himself, and when Esser ordered Williams to stop, he continued to tighten the sheet.  (Esser Decl. (dkt. #77) ¶ 30.)  Deciding that there was not enough time to ask permission for a use of force before Williams seriously harmed himself or became unconscious, Esser then ordered staff to bring him the OC foam spray, reasoning that OC spray was the best course of action because it was too dangerous to enter the cell and Williams posed an immediate risk to his own safety.

In contrast, Williams clarifies that he was actually holding "strips" of a spit mask braided into a noose.  Williams also maintains that Esser would not have been able to see the noose around his neck because he was standing in the corner of his cell, something he claims is confirmed by cell video footage from that day, showing Williams hiding in the

corner of the cell just to the right of the door.  (Williams Decl. (dkt. #84) ¶ 85; Ex. 1009, at 4:32-7:07.)  However, that footage also shows Williams holding what appears to be materials braided together to form a rope, which he is seen winding and unwinding between his hands.  While unclear precisely when it begins, Williams can also be seen standing in the corner talking to Esser through his cell window, then clearly wrapping the rope around his neck, walking out of the corner of the cell and pulling that rope around his neck.  (*See id.* at 6:37-7:07.)

Regardless, Lieutenant Esser claims that he continued to direct Williams to stop strangling himself so he could be restrained, and when he would not stop, Esser deployed OC foam.  Because Williams turned his back to the cell door, however, Esser believed the foam had no effect on Williams, who continued to strangle himself.  As a result, Esser administered a burst of OC from a fogger, a mechanism that sprays OC like a mist, covering the entire area of the cell; at that point, Williams pulled the sheet tighter and fell to his knees.  While in Esser's perception the OC was still having little effect (Esser Decl. (dkt. #77) ¶ 33), Williams claims that the OC made it harder to breathe (Williams Decl. (dkt. #84) ¶ 27), causing him to fall to his knees and fade in and out of consciousness.  (*Id.* ¶ 90.)  The video footage inside the cell also shows Williams starting to sway, dropping to his knees, then falling to his side, although it is unclear whether he continued to maintain his grip on the rope once he fell.  (Ex. 1009, at 8:47-9:44.)

Believing it too dangerous to send staff into the cell because the floor was now slick with the OC – and also that a Taser would not be effective because at that point Williams was lying down with his back towards his cell door and wearing a smock that the Taser could not penetrate -- Esser instead directed staff to get a pepper ball launcher, reasoning

12

that it was the best course of action given Williams' escalating self-harm.   Although supposedly falling in and out of consciousness, however, Williams now claims that the floor was *not* slick, so staff could have entered the cell, and Esser still had the option to use the taser on him up close, just as he had on June 25th.  (Williams Decl. (dkt. #84) ¶ 28.)  As for the video footage, Williams can be seen lying still on the floor of the cell, and it is still unclear whether he was continuing to strangle himself.  (Ex. 1009, at 9:44-11:07.)

At that point, Lieutenant Esser again directed Williams to stop his actions, then fired the pepper ball at the cell wall closest to Williams.   Esser's hope was that the projectiles filled with OC would break, which would affect Williams enough to stop him from self-harming.   Nevertheless, from Esser's perspective, Williams would not stop.   Once again directing him to stop and come to the cell door, Esser next launched additional projectiles at him, targeting Williams' right hand, the back of his right triceps, and shoulder.   In contrast, Williams claims that Esser started shooting at him before giving him another chance to comply, and he does not remember Esser telling him to come to the door as Esser was shooting at him.  (Williams Decl. (dkt. #84) ¶ 29.)  The audio from the video footage outside of the cell resolves some of this dispute, however, since Williams can be heard defiantly shouting back in response to Esser's directives, both before Esser started shooting the projectiles into the cell and after.  (Ex. 1008, at 00:50-1:40.)  Williams further attests that at some point he tried to move towards the door, but was afraid Esser would shoot him again, while Esser only agrees that Williams complied after being directly shot with the pepper balls.  (*Id.*)

13

Once shackled and removed from his cell, Nurse Edge checked Williams' vitals and offered him a breathing treatment.  Williams was then escorted to another cell and placed back in observation status after Edge medically cleared him.

### F.    Warden Haines' Review of Williams' Complaints

Williams is proceeding against Warden Haines based on the allegation that he reviewed Williams' complaints that incapacitating agents had been repeatedly used against him despite his medical history of asthma making it contraindicated.  While Williams attests to filing "several inmate complaints" about being sprayed with incapacitating agents, he does not attest *when* he submitted those complaints.  Even so, the Warden does not dispute that he reviewed Williams' inmate complaint and an incident report regarding the use of force on June 25, 2013, including noting Williams' contraindication to incapacitating agents due to his asthma.

### OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d

14

807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). All defendants seek summary judgment on the merits of plaintiff's claims, and on qualified immunity grounds.

## I.    Defendant Dane Esser

The Eighth Amendment prohibits the use of excessive force on prisoners.  For a plaintiff to succeed on an excessive force claim, however, he must submit evidence that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'"  *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Wilson v. Seiter*, 501 U.S. 294, 296 (1991)).  Relevant factors are:  (1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of threat to the safety of staff and inmates, as reasonably perceived by the responsible officials based on the facts known to them; and (5) any efforts made to temper the severity of a forceful response.  *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

The use of incapacitating agents in particular is not *per se* unconstitutional; rather, the use of incapacitating agents may serve a valid penological purpose if necessary to compel compliance or control over an inmate.  *Lewis v. Downey*, 581 F.3d 467, 476-78 (7th Cir. 2009); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1994) (finding that the use of pepper spray violates the Eighth Amendment only if used "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain").  Further, although "'it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable,' . . . an error of judgment does not convert a prison

15

security measure into a constitutional violation." *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012).

Defendants seek summary judgment with respect to the four incidents in which Lieutenant Esser used incapacitating tools, contending that the evidence of record establishes that his use was a good-faith effort to restore order, not a malicious attempt to harm plaintiff.   In opposition, plaintiff maintains that Esser knew that he had a contraindication for OC spray and used it on him despite knowing the danger it posed to his health, and more broadly, that the use of OC spray on him was prohibited by Wisconsin Department of Corrections policy.

As an initial matter, violation of an institutional policy does not *alone* amount to a constitutional violation meriting relief under § 1983.   *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 380 (7th Cir. 2017) (failing to follow nurse protocols did not establish an Eighth Amendment violation, since "[n]othing in the U.S. Constitution required [defendant] to follow INDOC's policies."); *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("An agency's failure to follow its own regulations does not rise to the level of a constitutional violation unless the regulations themselves are compelled by the Constitution.") (citations omitted).   In any event, there is no DOC policy that prohibits the use of OC spray for inmates with contraindications.   Rather, that policy requires medical personnel to be available to provide necessary care:

> In cases of planned uses of force where contraindications are present, if the need to use any of these tools is greater than or equal to the potential risk to the inmate, the tool may be used; however, HSU shall be on site prior to the use of the tool, if possible. . . .
> As soon as possible after one of the tools has been used, medical staff shall be advised.   Staff and/or the inmate shall be

16

> evaluated by medical staff and/or taken to the nearest medical
> facility as appropriate.

(DAI 306.07.03.V.B, Ex. 1000 (dkt. #75-1).)

Here, the evidence does not support an inference that any defendant violated that policy. HSU staff were not called to Williams' cell before each of the three instances in which OC spray was administered, but it is undisputed that plaintiff received medical attention after each, which included access to his inhaler and nebulizer treatments. As such, plaintiff's citation to DAI 306.07.03.V.B, and Esser's (or any other defendant's) knowledge of his contraindication to incapacitating agents, is not dispositive. Instead, the court must turn to the circumstances surrounding each of the four incidents in which Esser participated, including the fact that no medical staff ever noted a severe reaction to the use of OC on Williams nor advised against its use in the future if circumstances required it.

Esser is plainly entitled to summary judgment with respect to his use of OC spray on March 3 and May 25, 2013. By the time Esser approached Williams' cell on March 3, there is no dispute that he was already chewing on pieces of a broken glass bottle, which posed a significant and obvious threat to his safety. Whether something could have been done differently before then, Esser was more than justified in concluding that prompt intervention was necessary and appropriate. Moreover, Esser's orders to Williams proved fruitless, at which point he had to make a series of judgment calls. The first, that it would take too long to call his supervisor for approval to act, was well within his discretion to decide. So, too, the second, that it would be dangerous to require a team of officers to enter Williams' cell to ensure his safety and compliance with his orders, may or may not have been the correct decision, but even with the benefit of hindsight, it was not the *wrong*

one, much less one a reasonable jury could find wanton, malicious or sadistic.  Indeed, given Esser's knowledge of Williams' past incidents of self-harm, his judgment calls appear reasonable, and certainly does not support inferring an intent to harm.

While admitting that he was eating glass, plaintiff nevertheless challenges Esser's judgment to use OC spray given a medical contraindication, rather than waiting for a team to extract him physically.  Plaintiff further points out that he did not hear Esser threaten to spray unless he came out, and he claims that Esser sprayed him for longer than necessary -- up to 3 to 5 seconds, rather than 1.  Even accepting that Esser knew about his contraindication to incapacitating agents, no reasonable jury could second-guess Esser's belief that the OC spray was necessary to stop plaintiff's ongoing self-harm.  Moreover, Esser immediately ensured that plaintiff was seen by medical staff, further undermining any inference of a malicious or sadistic intent.  Finally, even assuming that Esser's burst of OC spray lasted 3 to 5 seconds, there is *no* evidence on which a jury could reasonably find that Esser continued to spray plaintiff unnecessarily, much less maliciously.

To the contrary, the evidence is that Esser's use of the OC spray ceased once Williams stopped eating the glass and started to comply with Esser's orders, and a constitutional claim does not hinge on whether Esser sprayed for one or five seconds under the exigent circumstances here.  While the court might well wish that more humane options had been available to Lieutenant Esser, no reasonable jury could conclude that his use of the OC spray demonstrated a malicious or sadistic intent to harm plaintiff under the circumstances, rather than an effort to prevent plaintiff from severely harming himself.  *See also Jones v. Sankey*, No. 18-C-445, 2018 WL 6445919, at *3-*4 (E.D. Wis. Dec. 10, 2018) (officer's decision to use a minimal amount of OC spray so that he could prevent inmate

18

from using an object for self-harm, coupled with the immediate access to health care, did not support a finding of excessive force or deliberate indifference).[7]

The outcome is the same with respect to plaintiff's claim against Esser for using OC spray on May 25, 2013.  While Esser did not actually witness plaintiff committing self-harm on the 25th, he obviously had reason to believe some degree of physical intervention was necessary given plaintiff's history of self-harm.  In addition, plaintiff appeared to be refusing to follow his orders after reportedly refusing to respond to earlier staff orders. Further, staff had been unable to determine whether plaintiff was harming himself because he had covered the cell camera and window with feces.  Plus, correctly recognizing that the need to use force immediately to ensure plaintiff's safety was lower than on March 3rd, Esser opted to get approval from his supervisor to use OC spray, reasoning that it was unsafe to enter plaintiff's cell because they could not see what he was doing on the other side of his feces-obscured window.  Finally, there is no dispute that even then, Esser administered OC spray briefly, using just two, one-second bursts of the spray to ensure that Williams came to the cell door, and before each of which giving him a chance to comply.

In opposition, plaintiff claims that he was not being *actively* resistive or disruptive, and was, in fact, sleeping.  Even assuming that were true (and this is one more unlikely part of plaintiff's version of events), plaintiff does *not* dispute having caused a disruption

---

[7] As this court has lamented in the past, the best option would have been to place an inmate committed to serious acts of self-harm in a program that can address it rather than keep him in an isolated observation cell where his psychological, manipulative and attention seeking activities are likely to fester and escalate.  *E.g., Goodvine v. Ankarlo*, No. 12-CV-134-WMC, 2015 WL 410326, at *5 (W.D. Wis. Jan. 29, 2015).  But that is beyond, the scope of this case, and certainly beyond the control of then-Lieutenant Essert or even WSPF's Warden.

19

and rousing suspicion that he was engaged in acts of self-harm or engaged in other dangerous behavior when covering his cell window and camera with feces.  As importantly, plaintiff again offers *no* evidence that would support a jury finding Esser's reported concerns were unreasonable.  Nor, as his supervisor agreed, did Esser have the luxury of time given that plaintiff was again on observation status at the time, *and* Esser was aware of plaintiff's history of self-harm.  If anything, Esser had an obligation to *act*.  *See Jones v. McClain*, No. 17-C-1523, 2018 WL 4039363, at *3 (E.D. Wis. Aug. 23, 2018) (officer entitled to qualified immunity for using OC spray on an asthmatic inmate, since the officer had an obligation to take some action in response to inmate's self-harm) (citing *Freeman v. Berge.*, 441 F.3d 543, 547 (7th Cir. 2006)).  Accordingly, Esser is entitled to summary judgment on the merit of claims arising out of both the March 3 and May 25 use-of-force incidents, and the court need not address defendants' qualified immunity argument.

The question is a closer one with respect to Esser's uses of force on June 25 and June 29.  When Esser intervened on June 25, there is no question that plaintiff was disobeying prison officials by refusing to remove his lunch tray from his cell window and hiding from the staff's view.  Given plaintiff's propensity towards self-harm and once again on observation status, there is also no question that Lieutenant Esser had to intervene, and his decision to take the time for a physical cell extraction was a proportionate response to the plaintiff's behavior.

Still, at least by the time plaintiff was secured and subjected to a strip search, plaintiff maintains that he was *not* resistive and complied with Esser's command to open his mouth.  According to Williams, Esser nevertheless directed staff to physically force his mouth open and then tased him for no apparent reason.  Williams further claims that his

20

request to see a nurse after this incident was outright denied.  Esser disputes all of this, maintaining that plaintiff refused to have his mouth searched repeatedly, thus justifying the use of the holds, and when that proved ineffectual, the eventual threat and ultimate use of a taser.

The court accepts, as it must, plaintiff's assertion that he opened his mouth as directed *before* Esser instructed the officers to use the holds or chose to employ his taser. Still, plaintiff has not attested that he actually *cooperated* with the officers' attempts to search his mouth, and so the record of whether plaintiff actually complied with Esser's directives is not as clear as plaintiff suggests.  This imprecision is material, given that by June 25, Esser knew that plaintiff was willing to put foreign objects in his mouth for purposes of self-harm, *and* plaintiff has not attested that the officers were able to complete a search of his mouth by manipulation of his jaw or other holds.  As such, contrary to plaintiff's assertion, the record does not establish that there was *no* need to use force when Esser instructed officers to use compliance holds and employed the taser.

Further, as for the degree of force used, plaintiff does not dispute that Esser's use of the taser was short-lived (2-3 seconds) and has submitted *no* evidence that he was injured, nor has plaintiff produced *any* evidence that might support a finding that Esser *intended* to harm him, rather than complete all elements of the strip search to ensure that plaintiff could not harm himself after just undergoing a justified, forced extraction of the plaintiff from an observation cell.  Given the immense challenge faced by an officer in Esser's position, who is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (U.S. 1989), although a reasonable jury *might* fault

21

Esser for insisting on plaintiff's full compliance with a search of his mouth, it could not reasonably conclude on the record here that Esser directed the holds or used the taser with a malicious intent to harm him. If anything, the jury would likely find that Esser acted with measured, reasonable responses throughout his interactions with plaintiff.

Similarly, on June 29, Esser was justified in responding with force upon seeing plaintiff's apparent effort to strangle himself. While plaintiff insists that Esser had no way of knowing *with certainty* that plaintiff was actually harming himself, the record confirms with more than enough evidence for Esser to reasonably believe plaintiff was attempting to use a stretch of material as a ligature to justify intervention, especially given his history of self-harm. Not only does Esser attest to his reason for concern, but the contemporaneous video footage within plaintiff's cell that day (Ex. 1009) shows plaintiff manipulating braided material *and* pulling the braided rope around his neck shortly before Esser employed the OC spray. As such, Esser cannot be faulted to his initial use of the OC foam, as well as OC spray after plaintiff remained standing and appeared to make no effort to comply with Esser's command to remove the rope from his neck.

This leaves the question of whether a reasonable jury could conclude on this record that Esser's final decision to use the pepper ball launcher reflected an intent to harm Williams, rather than to gain his compliance. Here, the contemporaneous video footage of what plaintiff was doing *inside* the cell is less helpful to defendant Esser, because it appears to show plaintiff fall to his knees, and then onto his side (Ex. 1009, at 8:47-9:44) *before* Esser used the pepper ball launcher on him. Nevertheless, in viewing the footage from outside the cell in tandem with the footage of plaintiff's resistance inside the cell, no reasonable jury could conclude that Esser used the launcher in an attempt to *harm* plaintiff.

22

To start, Esser may have had other options beyond escalating the degree of force to the pepper ball launcher at that point, but his options were extremely limited.  He could not see well into the cell, plaintiff is seen in the video footage purposely standing in areas out of the officers' view and wrapping the material around his neck, and just days before Esser had a similar encounter during which plaintiff had been attempting self-harm with an unidentified object.  Accordingly, Esser had good reason to believe that he had insufficient time to organize a cell extraction and that plaintiff would be non-compliant upon entry.  As such, a reasonable jury could not conclude, as plaintiff now argues, that Esser should have waited to assemble a cell extraction team *while* plaintiff continued to grasp at the fabric tied around his neck.  If anything, based on what Esser knew at the time, waiting could easily have resulted in plaintiff suffering a greater degree of self-harm than the prompt use of escalating OC.

Furthermore, Esser attests that even after plaintiff dropped to the floor, he perceived plaintiff's movements at that point as evidence of his continued, volitional noncompliance *and* efforts to harm himself with his self-fashioned noose.  Although plaintiff disputes what he was *actually* experiencing, the video and audio footage establishes that Esser's belief was eminently reasonably.  Specifically, the footage inside the cell shows plaintiff's arms remained up by his head even when he was on the ground, and audio footage shows that plaintiff was still yelling out at the officers before and even while Esser was employing the pepper ball launcher.  So even if plaintiff was, as he claims, barely conscious, it was not unreasonable for Esser to perceive plaintiff to be both conscious and actively resisting his repeated command to stop self-harming.  Esser's decision to employ the launcher repeatedly, in periodic bursts, until plaintiff complied by standing up and approaching the

door, which plaintiff accomplished quickly and with seemingly little effort, does not support an inference of an intent *solely* to harm plaintiff. Accordingly, the court will grant summary judgment to defendants with respect to plaintiff's claims against Esser.

## II.    Defendant Chad Lentz

The Eighth Amendment also prohibits prison officials from responding to an objectively serious risk of harm with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994); *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018). To prove his claim of deliberate indifference against Lentz, therefore, plaintiff must adduce evidence permitting a reasonable jury to find he was "cognizant of the significant likelihood that [Williams] may imminently seek to take his own life *and* yet failed to take reasonable measures to prevent him from doing so. *Collins v. Seaman*, 462 F.3d 757, 761 (7th Cir. 2006); *see also Davis -Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) ("A risk of future harm must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk.") (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality)). Deliberate indifference is "more than mere or gross negligence, but less than purposeful infliction of harm." *Lisle v. Welborn*, 933 F.3d 705, 717 (7th Cir. 2019)(quoting *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)).

Defendants seek summary judgment with respect to plaintiff's deliberate indifference claim against Lentz because there is insufficient evidence for a jury to find that he was aware plaintiff would break and then use glass shards from a nasal spray bottle to commit self-harm. Plaintiff argues the opposite.

24

Lentz stresses that he was unaware of any policy prohibiting inmates on observation status from possessing a glass nasal spray bottle, explaining that he had just recently started working at WSPF, and his prior institution used a different sticker system to identify inmates who could not possess glass objects.  While Lentz's ignorance of that policy is at least plausible, especially since HSU apparently kept the bottle on the cart for Williams' possible use, it does not entitle him to summary judgment given plaintiff's version of their interaction.  Regardless of any policy applicable to inmates on observation status, plaintiff claims that Lentz *knew* he would commit serious self-harm with any object he obtained, including the glass spray bottle.  Leaving aside whether Lentz *should* have known that plaintiff was facing a mental health crisis because he was on observation status, plaintiff attests that even after he *told* Lentz that staff did not believe he would use "anything" to harm himself, Lentz smirked, shook his head, and provided him the glass bottle.

Given the overall context, the court sincerely doubts that a reasonable jury will believe plaintiff's description of their interaction (as opposed to Lentz's version, in which plaintiff requested the nasal spray and made no mention of self-harm), but were the jury to do so, it might reasonably infer from Lentz's alleged smirk, that his actions crossed the line from mere negligence or recklessness into a conscious disregard of the real possibility that plaintiff would severely harm himself.  *Miller v. Harbaugh*, 698 F.3d 956, 963 (7th Cir. 2012) ("If the state officers can observe or are told that their detainee is indeed so disturbed that his next step is likely to be suicide, and yet they do nothing, it is fair to say that they have gone beyond mere negligence and entered the territory of the deliberately indifferent."); *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (deliberate indifference

25

requires a showing of "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks).

Lentz further argues that a jury could not reasonably find he acted with deliberate indifference, since there appears no dispute that once it became apparent plaintiff was not returning the nasal spray, Lentz asked and then ordered plaintiff to return the nasal spray bottle.  Indeed, this might be a compelling argument for the jury if he had then called for help from other officers, but Lentz does not attest to that.  Rather, Officer Foley attests that he happened to walk into the range, and he, too, ordered plaintiff to return the nasal spray.  Plus, neither Lentz nor Foley were able to prevent plaintiff from harming himself once he had the nasal spray bottle.

Frankly, the court finds this claim to be a very close call, even on summary judgment, and believes a lay jury will equally view plaintiff's version of events with great skepticism.  Still, if a jury were to believe plaintiff, it *might* reasonably conclude Lentz was deliberately indifferent to the real risk that plaintiff would harm himself.  For that same reason, Lentz is not entitled summary judgment on the basis of qualified immunity.  *See Weinmann v. McClone*, 787 F.3d 444, 451 (7th Cir. 2015) ("The existence of a factual dispute about the circumstances surrounding McClone's decision to fire on [Weinmann] precludes a ruling on qualified immunity at this point.").  Accordingly, the court will reluctantly allow plaintiff's claim against defendant Lentz to proceed to trial.

## III. Blume, McClain, Edge, Haines

Finally, defendants seek summary judgment on plaintiff's claims against Blume, McClain, Edge and Haines for allegedly failing to intervene to prevent his self-harm.  A

26

prisoner asserting a failure-to-intervene claim must prove:  (1) the officer had reason to know that excessive force was being used; and (2) the officers "had a realistic opportunity to intervene to prevent the harm from occurring."  *Lewis*, 581 F.3d at 472 (granting summary judgment on failure to intervene claim where the use of pepper spray was spontaneous and thus completed before bystander prison guards could prevent it); *see also Gill v. city of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).  As an initial matter, plaintiff offers no evidence that any of these defendants were present or nearby when then-Lieutenant Esser administered incapacitating agents on plaintiff.  In fact, there appears no dispute that defendants Blume, McClain and Edge in particular were only involved *after* Esser had used the OC spray on him.  As to these three at least, it would seem to follow that none of them had a reasonable opportunity to intervene to prevent or curb Esser's use of force.

Nonetheless, plaintiff's position is that each of these defendants violated his Eighth Amendment rights because they should have prevented OC spray from being used on him in the first place.  To the extent plaintiff challenges the DOC's policy governing the use of OC spray for inmates with a contraindication, that policy is not so clearly problematic to create an obligation by these defendants to object to or change the policy.  Indeed, that policy reflects not only an attempt to balance institutional safety and security against individual inmate safety, but was also consistent with the clearly established law at the time.  *See Kervin v. Barnes*, 144 F. App'x 551, 552 (7th Cir. 2005) ("This court has held that prison guards may use chemical sprays when reasonably necessary to subdue recalcitrant prisoners, for orders must be obeyed, and there are only so many choices available to correctional officers when inmates refuse.").

27

Furthermore, plaintiff's suggestion that these three defendants should have taken steps to except plaintiff *specifically* from the policy has no traction.  In each of the instances described above, the OC spray was used to prevent plaintiff from further harming himself.  Even more importantly, no evidence of record suggests that plaintiff's reaction to the OC spray was so severe that the risk of using it on him outweighed the risk of allowing him to continue harming himself while prison officials attempted other methods of intervention, including calling in a cell extraction team.  To the contrary, the most extensive medical attention plaintiff required following any of these incidents was a nebulizer treatment *days* after the March 3 use of OC spray, and plaintiff has not submitted evidence that defendants Blume, McClain or Edge were even aware that he required such treatment.  As such Blume, McClain or Edge would have had no reason to believe the policy allowing use of OC posed a significant safety risk to plaintiff, much less that they should have taken further action to alert the appropriate prison personnel to their concerns.  Accordingly, defendants Blume, McClain and Edge are entitled to summary judgment on the merits and on qualified immunity grounds.

As for WSPF Warden Haines' motion for summary judgment, plaintiff maintains that he should be held liable given his awareness that Esser was using OC spray in violation of DOC policy.  However, the court has already held that Esser's decision to administer the OC spray did *not* violate DAI Policy 306.07.03V, since medical attention was promptly offered him after the OC spray was administered, nor could it form a basis for constitutional liability even if it had.  *See Glisson*, 849 F.3d at 380.  Haines is entitled to summary judgment for that reason.

28

Nor may Warden Haines be held separately liable for his alleged review and denial of plaintiff's inmate complaints about the use of OC spray on him.  In general, prison officials who deny inmate complaints "but who otherwise did not cause or participate in the underlying conduct" may not be held liable under § 1983.  *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)); *see also See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.  The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay in their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.").  Plaintiff neither specified *when* he submitted inmate complaints or communications to Haines about Esser's use of incapacitating agents; nor has he suggested that in submitting the inmate complaints, he alleged that its use was an ongoing or even frequent problem.  As such, the evidence does not allow an inference that between May and June of 2013, Warden Haines was aware that Esser was improperly using incapacitating agents on plaintiff on an ongoing basis and failed to take corrective action.  Accordingly, like Edge, Blume and McClain, Haines is entitled to summary judgment as well.

ORDER

IT IS ORDERED that:

1)  Defendants' motion for summary judgment (dkt. #72) is DENIED in part with respect to plaintiff's Eighth Amendment deliberate indifference claim against Lentz, and GRANTED in part as to all claims against the other defendants Dane Esser, Haines, Blume, Edge and McClain.

2) Along with this Opinion and Order, the court will issue a Trial Preparation Order that plaintiff should use as a guide as he prepares for trial on his remaining claim against defendant Lentz.

Entered this 19th day of May, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge